IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 8, 2010 Session

BAILEY TOOL & MANUFACTURING CO. v. FORREST BUTLER ET AL.

Appeal from the Chancery Court for Davidson County
No. 06-2532-II     Carol L. McCoy, Chancellor

No. M2009-00685-COA-R3-CV  - Filed May 21, 2010

This is a dispute between two companies that supply parts in the automotive industry.
Company A claims that Company B tortiously interfered with its contract and with its
business relationships.  The trial court granted summary judgment on the grounds that there
was no genuine issue of material fact as to causation and that Company B conclusively
established the affirmative defense of justification.  We affirm the decision of the trial court
because Company B negated the element of causation.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR.
and RICHARD H. DINKINS, JJ., joined.

Donald N. Capparella and Candi Renee Henry, Nashville, Tennessee, for the appellant,
Bailey Tool & Manufacturing Company.

Samuel P. Funk and Mark T. Smith, Nashville, Tennessee, for the appellees, Forrest Butler
and Servitech Industries, Inc.

OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Bailey Tool and Manufacturing Co. ("BTM"), a Texas company, manufactured metal
parts.  Servitech Industries, Inc. ("STI"), a Tennessee company, applied coatings to parts.
Both companies supplied parts in the automotive industry and did business with another parts
manufacturer, Cooper Standard Automotive ("Cooper").

In 2002, General Motors ("GM") engaged Cooper to produce a body mount that included two split shell bushings. According to GM's specifications, the bushings were to be coated with SermaGard, a type of ceramic coating. STI is a licensed SermaGard applicator. Cooper got a quote from STI regarding the cost for coating the bushings. Cooper decided to use BTM as its "Tier I" (direct supplier) for the bushings, which meant that BTM would stamp the bushings and be responsible for getting them coated with SermaGard by STI, the "Tier II." In an August 2002 proposal to BTM, STI agreed to coat the bushings at a price of 14 cents per part with payment terms of 30 days from invoice date.[1] Once production began, BTM shipped stamped parts to STI for coating, and STI would then ship the coated parts to Cooper. Cooper paid BTM for the parts, and BTM was responsible for paying STI for the coating work.

From the beginning of this contractual relationship, problems developed between BTM and STI. Forrest Butler, president of STI, testified in his deposition that his relationship with John Buttles, president of BTM, "got off on the wrong foot." At a September 2002 meeting, representatives from both companies, including Butler and Buttles, met to work out some early problems. Butler and Buttles disagreed over the coating thickness required under GM's specifications; Buttles thought some problems with the bushings arose because STI's coating was too thick.

Butler thereafter began having communications with officials at Cooper regarding his desire to replace BTM as the Tier I on the project. In an October 2002 e-mail to Gene Emenhiser at Cooper, Butler stated that he "wanted to discuss the potential of our company [STI] selling SermaGard coated components direct to Cooper" and that he believed STI could offer "a lower unit price." In February 2003, Butler sent another e-mail to Emenhiser in which he suggested the possibility that there would be "adequate economies" to allow STI to give Cooper a good price on spraying another part, the "Gordy/Graham part," if STI were the Tier I on both the Gordy/Graham part and the BTM part. Butler referenced a previous conversation with Emenhiser in which Butler had expressed "concerns for the quality/turnaround/reiumbursement capability" for BTM. Butler proposed that STI would hire someone to oversee the stamping-related products and to streamline the process to get "a better product at a lower cost."

Although Butler did not think STI had begun having payment problems with BTM by February 2003, he testified that, "The experience I have had with people that have issues in

---

[1]Neither the contract between Cooper and Bailey nor the contract between BTM and STI was memorialized in writing. The contracts were carried out through purchase orders.

turnaround and/or quality are going to have issues with payment." Emenhiser testified that prior to the August/September 2006 incident at issue in this case, STI had contacted Cooper "a few times" about payments problems with BTM. Emenhiser did not think this occurred "more than four or five times." Butler testified that payment problems were "a continuing issue" in STI's relationship with BTM. STI records show that BTM's payments were typically made over 30 days after invoice, with most payments taking over 70 days and some over 100 days. Emenhiser testified that there were times when Cooper paid BTM more than 100 days after invoice.

A February 2004 e-mail from Kevin Cradduck, chief operating officer at STI, to Butler indicates that Ronnie Daniels, a Cooper employee, was talking to STI about the possibility of making STI the Tier I instead of BTM. According to Craddock's e-mail, Daniels was "very frustrated with Bailey and would like nothing better than to de-source[2] them." In furtherance of its desire to replace BTM as the Tier I, Butler solicited quotes from other stampers as to how much they would charge to create the split shell bushing currently being produced by BTM. In April 2004, Butler e-mailed Emenhiser with pricing information on his proposal to become Tier I on the split shell bushing part. Butler commented that, "I have to believe our steel supplier will be vastly more consistent in quality, price & delivery than your current supplier [BTM]."

In a February 2004 e-mail to Buttles at BTM, Cradduck made the following statements:

> Once again we find ourselves in a situation where your company has fallen behind in paying Servitech Industries' invoices. In total, Bailey Tool owes us in excess of $70,000. Our quoted terms are net 30 days. The total amount that is past 30 days is $43,932. We are typically willing to live with stretching to 60 days and in this case, we know that Cooper is even going out to 75 days in paying you. The over 60 day balance due Servitech is $33,852. Over 75 is $30,492. We are not given the luxury of going beyond 30 days with our coating supplier so when our customers are late to pay, it severely impacts our cash flow.
> . . . .
>
> This situation is unacceptable. It is imperative that your company get caught up to at least 75 days immediately. We cannot finance Bailey Tool. I have had this discussion with you in the past. In that conversation, I told you we would be willing to live with 75 days. If this continues, we will be forced to insist

---

[2]It appears that "de-sourcing" is an industry term for replacing a supplier.

upon our quoted 30 day terms or possibly even move to a pre-payment requirement.

On September 12, 2006, Butler sent an e-mail to Emenhiser informing him of a price quotation from Hines Group, another stamper and a possible replacement for BTM. Butler stated that it was his understanding from Bill Simpson, a metals expert whom Butler had previously proposed hiring to oversee the stampings should STI be named the Tier I on the project, that Dave Petrie at Cooper wanted to remove BTM as a supplier. Butler expressed his interest in having STI be the Tier I, or if Cooper felt Hines was "a better fit," to support Hines as the new Tier I.

BTM admits that in the late summer of 2006, it had fallen behind on its payments to STI and owed STI approximately $200,000.[3] According to STI, BTM owed it approximately $275,000 by mid-September 2006. On September 15, 2006, Butler demanded that BTM have $25,000 wired to Servitech by September 18. BTM paid $25,000 on September 18, 2006. Buttles testified that he agreed to pay $25,000 every week thereafter to pay down BTM's balance.

Butler called Emenhiser at Cooper on September 19, 2006, to complain about BTM's lack of payments. While in Canada on September 27, 2006, Butler went to meet with Petrie at Cooper about his problems with BTM. Butler explained the early quality/sorting issues and the ongoing payment problems. Petrie's deposition testimony includes the following statements:

> And then [Butler] further said to me that there was–Bailey was constantly late paying them, there was times anywhere from 70 to 120 days, and that he was getting very worried because it was getting to the level of payment that he owed them that it could jeopardize shipment [by STI of coated parts to Cooper].
> . . . .
>
> I know [Butler] was very concerned that he was not getting paid and I believe at that time it was between [$] 240 and 270,000. Well, as soon as I hear that about a supplier, then I start worrying about a supplier that are they in jeopardy of closing their doors because I've got quite a few product[s] with that supplier. So then now I have to start investigating on that supplier to find out what the heck is going on.

---

[3]There was a dispute between STI and BTM concerning which party was responsible for about $40,000 in sorting costs necessitated by defects.

Petrie thereafter contacted Buttles at BTM. According to Petrie's deposition testimony, Buttles "wouldn't give me an answer on when it was going to be resolved so based on not being paid, I had to make a decision for our company." After receiving another communication from STI stating that STI was "very close to deciding not to ship anymore or not to coat anymore parts because they were not getting paid," Petrie decided to change its relationship with BTM and to pay STI directly for all future coating. Beginning in October 2006, Cooper directly paid STI 14 cents per coated part, the same price STI had been receiving when BTM was Tier I.

Because BTM was no longer Tier I and thus was no longer managing STI as its supplier, Cooper asked BTM to provide a price for just stamping the part. BTM thereafter provided stamping at $.045 less per part than the amount it received as Tier I after it paid STI.

In October 2006, STI filed a complaint for breach of contract on sworn account against BTM seeking to recover $242,014 for part-coating services. BTM answered, denying liability, and filed a counterclaim against STI and Forrest Butler, alleging causes of action for tortious and unlawful interference with the contract between BTM and Cooper, intentional interference with the business relationship between BTM and Cooper, and unfair and deceptive acts under Tenn. Code Ann. § 47-18-104(b). BTM asserted that the substantive law of Texas, particularly the common law regarding tortious interference with contract, applied to this action.

The parties engaged in discovery. BTM amended its counterclaims in May 2007 to allege claims of tortious and unlawful interference with contract and intentional interference with business relationships under both Texas and Tennessee law. In August 2008, STI and Butler filed a motion for partial summary judgment asking the court to determine that Tennessee substantive law governed BTM's common law counterclaims and to dismiss all Texas counterclaims. The court ruled that Texas law should govern BTM's claims for tortious and unlawful interference with contract and intentional interference with business relationships and, therefore, denied STI's motion for partial summary judgment.

STI filed a second motion for partial summary judgment on its breach of contract claim against BTM and BTM's counterclaims against STI and Butler. BTM did not oppose the motion with respect to STI's breach of contract claim but did oppose the motion with respect to its own tort counterclaims. In an order entered on December 18, 2008, the trial court granted STI's second motion for partial summary judgment and entered judgment against BTM in the principal amount of $206,432.76 (an amount to which the parties stipulated), $46,487.36 in prejudgment interest, and postjudgment interest. In dismissing

counts I and II of BTM's amended countercomplaint (the claims for tortious and unlawful interference with contracts and intentional interference with business relationships), the court made the following findings:

> [T]he Court having found that there is no genuine issue of material fact and that Servitech and Butler have (1) affirmatively negated under any circumstance the element of causation essential to Bailey's claims, and (2) conclusively established their affirmative defense of justification because, as a matter of law, they were pursuing a legal right, all of Bailey's claims under Counts I and II of its Amended Countercomplaint are dismissed with prejudice
> . . . .

The court also found that the applicable two-year statute of limitations required the dismissal of any claims under Counts I and II of the amended countercomplaint to the extent the claims were based on communications occurring before December 22, 2004.

STI filed a second amended complaint in February 2009 but then voluntarily dismissed without prejudice the remaining claims set out in the second amended complaint. BTM filed a timely notice of appeal.

ISSUES ON APPEAL

BTM argues on appeal that the trial court erred in granting summary judgment because genuine issues of material fact remain on the issue of causation and on the affirmative defense of justification.

STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.04. Summary judgments do not enjoy a presumption of correctness on appeal. *BellSouth Adver. & Publ'g Co. v. Johnson,* 100 S.W.3d 202, 205 (Tenn. 2003). We consider the evidence in the light most favorable to the non-moving party and resolve all inferences in that party's favor. *Godfrey v. Ruiz,* 90 S.W.3d 692, 695 (Tenn. 2002). When reviewing the evidence, we must determine whether factual disputes exist. *Byrd v. Hall,* 847 S.W.2d 208, 211 (Tenn. 1993). If a factual dispute exists, we must determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Id.; Rutherford v. Polar Tank Trailer, Inc.,* 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998). To shift the burden of production to the nonmoving party who bears the burden of proof at trial, the moving party must negate an element of the opposing

party's claim or "show that the nonmoving party cannot prove an essential element of the claim at trial." *Hannan v. Alltel Publ'g Co.,* 270 S.W.3d 1, 8-9 (Tenn. 2008).

ANALYSIS

We have concluded that the trial court properly granted summary judgment on BTM's tort counterclaims because there was no genuine issue of material fact on the issue of causation and STI was entitled to judgment as a matter of law.

Under Texas law, the torts of tortious interference with contract and interference with business relationships both require that the defendant's actions caused the plaintiff's damages. *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996); *Am. Med. Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 335 (Tex. Ct. App. 1991). In this case, BTM claims as damages the difference in price it received after Cooper started paying STI directly for its coating services.

In support of its motion for partial summary judgment, STI submitted the deposition testimony of Petrie and Emenhiser to establish that the cause of Cooper's decision to change its relationship with BTM was BTM's failure to pay STI. It is undisputed that it was Petrie who made the decision to change Cooper's contract with BTM. Petrie testified as follows:

> A. . . . [T]he day it was decided that we would start paying Servitech directly, I was on the road, I was out of town and I got a phone call from Charlene Cunningham telling me they received a phone call from Servitech and Servitech stated that they were very close to deciding not to ship anymore or not to coat anymore parts because they were not getting paid. I immediately told Charlene to get in touch with our controller to ensure that we could start paying Servitech directly . . . .
> . . . .
>
> Q. I'm not asking if you think it's right or wrong. What is the sequence? The triggering event was Forrest Butler coming to Cooper and say I'm not getting paid, want you to make a change.
>
> [Exchange between attorneys]
>
> THE WITNESS: . . . Based on Mr. Butler calling me, it was not–based on Mr. Butler, as you're saying–I get the feeling you're trying to say to me that the only reason I changed was because Butler come [sic] and asked me. It's not

-7-

why I changed. The things were changed because our company–there was the threat, that we would not have parts to supply our customer.

In response to another question regarding whether Cooper's change had been caused by Butler's request, Petrie stated: "The question you're asking me doesn't make sense because if [Buttles] had paid the supplier [STI] we would not be into this issue at all." Petrie explained that he had to notify other managers in the plant of the reason for the change and then get corporate to agree, and that "the reason was that we were in jeopardy of shutting a customer down." According to Petrie, Buttles "wouldn't give me an answer on when it was going to be resolved so based on not being paid, I had to make a decision for our company on do I just sit back and do nothing and then finally let Servitech say I'm not getting paid anymore?" Petrie stated that he could not allow that to happen. Petrie also gave the following testimony:

> Q. And you understood that Bailey had outstanding amounts that were substantial in terms of the amount of money that was owed that had not been paid to Servitech in a timely fashion.
>
> A. That is correct.
>
> Q. And that was the precipitating event as you understood it for the communication from Servitech to Charlene that the flow of product might be interrupted, correct?
>
> A. That's correct.

Like Petrie, Emenhiser testified that Cooper had to change its relationship to BTM because Servitech was "not getting paid for coating the parts so we had to do something different."

Presented with a properly supported motion for summary judgment, a nonmoving party must "produce evidence of specific facts establishing that genuine issues of material fact exist." *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008). The nonmoving party may satisfy its burden of production by doing the following:

> (1) pointing to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitating the evidence attacked

by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule 56.06.

*Id.* (quoting *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)).

In this case, BTM cites part of the testimony of Butler to support its assertion that material issues of fact remain as to what caused Cooper to decide to change its relationship with BTM. Butler's deposition testimony includes the following statements:

A. . . . And that's the reason why I went to Cooper. And the people that were in on that conversation will testify I said I've got to be paid. And it's obvious to me Bailey Tool is not paying, and I need Cooper Standard to pay me or I'm not doing the job.

Q. And Cooper did what you asked them to do, they went–they broke up the contract and said we're going to pay you directly. They did exactly what you asked them to do, didn't they?

A. That's correct.

As to his meeting with Petrie, Butler testified: "I said, John [Buttles] doesn't agree with this, you're going to have to pay me direct. And two days later, he set it up. That's the way it appears to me."

BTM asserts that there is a conflict between the testimony of Petrie and Emenhiser on one hand and the testimony of Butler on the other. BTM argues that, in light of the testimony and "the evidence of Forrest Butler's repeated disparagement of Bailey Tool, a reasonable jury could certainly disagree as to whether Dave Petrie independently made a business decision in light of a supplier's cash flow problems, or whether Forrest Butler inappropriately strong-armed him into altering Cooper's contract with Bailey Tool." We cannot agree. There is no real conflict in the testimony. Petrie, Emenhiser, and Butler all testified that Cooper changed its contract with BTM because of BTM's payment problems and STI's resulting notification that it might have to stop coating and/or shipping coated parts. Butler's statement that Cooper did what Butler asked by changing its relationship with BTM is not inconsistent with the testimony that Cooper's actions were the direct result of STI's intention of ceasing its coating services because it was not being paid by BTM.

There is no evidence to suggest that Petrie's decision to change its relationship with BTM was affected by Butler's alleged four-year campaign of statements disparaging BTM. In fact, there is no evidence that Petrie was even aware of Butler's dislike of Buttles and his

previous disparaging comments about BTM.[4] Moreover, the action taken by Cooper was to pay STI directly, not to make it the Tier I, and BTM continued to stamp parts for Cooper. Even if Butler's actions could be found to be improper, there is nothing in the record to suggest that his disparaging remarks played a role in the decision made by Cooper about which BTM is complaining.

BTM also argues that summary judgment is not appropriate because witness credibility is at issue. BTM asserts that a jury should be able to decide the weight of the testimony of Emenhiser and Petrie because of their personal bias. This court has recognized that "summary judgments should not be granted in cases where the outcome hinges squarely upon the state of mind, intent, or credibility of the witnesses." *Knapp v. Holiday Inns, Inc.*, 682 S.W.2d 936, 941-42 (Tenn. Ct. App. 1984). The opponent to the motion for summary judgment must raise a genuine doubt as to witness credibility. *Id.* at 942. Thus, we have stated:

> The credibility concerns that warrant denying a summary judgment must raise to a level higher than normal credibility questions that arise whenever a witness testifies. Any other rule would essentially prevent the courts from granting a summary judgment in any case. Thus, this court has found that credibility concerns preclude granting a summary judgment in cases where a witness's credibility has been specifically challenged, *Knapp v. Holiday Inns, Inc.*, 682 S.W.2d 936, 943 (Tenn. Ct. App. 1984), or where the record contained clear evidence of a witness's lack of credibility. *Burgess v. Harley*, 934 S.W.2d 58, 68 (Tenn. Ct. App. 1996) (witness giving inconsistent statements).

*Hepp v. Joe B's, Inc.*, No. 01A01-9604-CV-00183, 1997 WL 266839, at *3 (Tenn. Ct. App. May 21, 1997).

In the present case, we do not find that witness credibility is a genuine issue. As stated above, on the question of what caused Cooper to change its relationship with BTM, we see no real conflict in the testimony. Moreover, we find the reasons cited by BTM for questioning the credibility of Emenhiser and Petrie to be unconvincing.

As to Emenhiser, BTM argues that his testimony is "subject to bias, considering his personal relationship with Forrest Butler." Emenhiser testified that he had known Butler for about 15 years through their business dealings. Butler estimated that he met with Emenhiser about once a year, that they had dinner together on occasion, that he had met Emenhiser's

---

[4]Petrie and Butler met for the first time at the September 2006 meeting.

wife, and that he and Emenhiser had golfed together. These facts are consistent with a business relationship. Moreover, the reasons cited by BTM for questioning Emenhiser's credibility do not bear on the issue of causation. BTM asserts that, "[c]onsidering the relationship between Forrest Butler and Gene Emenhiser, it is reasonable to assume that Gene Emenhiser might be inclined to view Forrest Butler's behavior as acceptable, even if such behavior was against prevailing ethical standards within the industry." On the causation element, however, the only issue is what caused Cooper's actions in changing its relationship with BTM, not the propriety of Butler's actions.

As it was Petrie who made the decision to change Cooper's relationship with BTM, his testimony is the most pertinent on the causation issue. BTM attempts to create an issue of bias by pointing out that Petrie had left Cooper by the time of this deposition and that part of his stated reason for leaving was that he would not be comfortable working for a new vice-president who allegedly liked to surround himself with "yes person[s]." According to BTM's logic, "Mr. Petrie's testimony indicates that he would be unwilling to acknowledge or admit that anyone else could affect his decisionmaking," and "[t]his is a form of bias." Such speculation is not sufficient to create a genuine issue of credibility.

Given our conclusion that the trial court properly granted summary judgment because STI negated the element of causation, we need not consider the affirmative defense of justification.

CONCLUSION

We affirm the trial court's decision. Costs of appeal are assessed against the appellant, for which execution may issue if necessary.


_____
ANDY D. BENNETT, JUDGE